George E. HATHAWAY

v.

Clayton L. RANCOURT and
Josephine M. Rancourt.

Supreme Judicial Court of Maine.

Nov. 20, 1979.

Twitchell, Gray, Linscott & Badger by Pamela D. Chute (orally), Richard M. Maraghy, Willard H. Linscott, Jean M. Deighan, Bangor, for plaintiff.

Blake & Hazard by Roger F. Blake (orally), Belfast, for defendant.

Before McKUSICK, C. J., and WERNICK, ARCHIBALD, GODFREY, NICHOLS and GLASSMAN, JJ.

WERNICK, Justice.

Pursuant to 14 M.R.S.A. § 6701, plaintiff George E. Hathaway brought a civil action in the Superior Court (Waldo County) seeking to establish his title to a strip of land situated in Winterport, Maine, against defendants Clayton L. and Josephine M. Rancourt who disputed plaintiff's claim of title. Plaintiff also demanded damages for rents, profits and waste. In their answer to plaintiff's complaint defendants included a counterclaim asserting that they had title to the disputed strip and demanding that plaintiff be required to pay them damages for rents, profits and waste.

Plaintiff's claim is that the disputed strip was part of a parcel of land conveyed to him in 1969 by deed of Clifford E. and Arlene Woodman. This deed granted title to plaintiff of:

"A certain lot or parcel of land situated in said Winterport, bounded and described as follows: Beginning at a stake and crooked maple tree at Marsh Stream on the line of land formerly of Theodore M. Campbell; thence northerly by said Campbell's land about eighty (80) rods to the road; thence westerly on said road about forty (40) rods to a bog hole and log in the fence with a notch cut in it; *thence southerly about eighty (80) rods to said stream*; thence easterly by said stream to the place of beginning, containing thirty (30) acres, more or less." (emphasis added)

Defendants maintain that they have title to the land in dispute by virtue of a 1965 conveyance to them by C. Oliver and Beatrice Emerson. This deed, however, identifies the easterly boundary line of the land conveyed to defendants only by reference to the land owned by plaintiff, describing said easterly boundary as the westerly boundary of the land of plaintiff. For this reason, the focus of the dispute between the parties is the location on the face of the earth of the westerly boundary line of the land to which the Woodman deed granted title to plaintiff.

To assist in the understanding of the issues, and for ease of reference, we have attached to this opinion as an Appendix a copy of a "site plan" prepared by Registered Land Surveyor Gilbert S. Viitala that had been introduced in evidence identified as Plaintiff's Exhibit # 2. On this site plan the line which plaintiff claims as the westerly boundary of his land is marked "line testified to at trial", running from Stream Road to the area where Clark Brook and Marsh Stream are in confluence. The line contended for by defendants as the westerly boundary of plaintiff's land (the easterly boundary of defendants' land) is shown on the site plan as "new painted line" running from Stream Road to Marsh Stream. The disputed area between these two lines contains approximately 9 acres.

After a bench trial, the Superior Court ordered entry of judgment to the effect: (1) on plaintiff's complaint, judgment for defendant; (2) on defendants' counterclaim, judgment adjudicating: (a) defendants have title to the strip in dispute, on the basis that the westerly boundary line of plaintiff's land is adjudicated to be the "new painted line" designated on the appended Viitala site plan, and (b) no damages awarded to defendants.[1] From the entry of judgments so providing plaintiff has appealed to this Court.

■ Our study of the opinion written by the Justice presiding in the Superior Court reveals that the Justice reached the conclu-

---

1. An original entry of judgment in the Superior Court dealt only with plaintiff's complaint and failed to dispose of defendants' counterclaim. When, therefore, plaintiff purported to appeal from such original judgment against him on his complaint, this Court held the appeal premature. The case was remanded to the Superior Court for further proceedings to have an appealable judgment entered, either by the entry of a judgment on defendants' counterclaim or by entry of an order pursuant to Rule 54(b) M.R.Civ.P. Plaintiff's present appeal was taken after the parties had stipulated that judgment be entered on the counterclaim adjudicating that defendants had title to the land in dispute, but denying them an award of damages.

sion he did by resting his analysis on a foundational premise that was never expressly stated or in any manner shown to be justified. This hidden assumption was that the westerly boundary line of plaintiff's land must be located as running along a course *parallel* to the easterly boundary. We have examined the relevant deeds in evidence, as the only source from which such a mandate of parallelism could arise, and we conclude that, properly interpreted, the calls in those deeds establish no such directive of parallelism as the presiding Justice assumed. We decide, therefore, that by committing himself to establish the course of the westerly boundary line of plaintiff's land parallel to the easterly boundary line, the presiding Justice made an error of law requiring that plaintiff's appeal be sustained.

We conclude further, however, that the sustaining of plaintiff's appeal does not necessitate a remand of the case to the Superior Court for fact-finding either on· the present record or after another evidentiary hearing. After purging from the presiding Justice's opinion the parallelism error, we find that we can apply to the Justice's findings of fact our own interpretation of the calls in the relevant deeds of record, *as law*, and, acting strictly on the basis of law, order entry of the appropriate judgments required by law.

The presiding Justice obviously concluded, and correctly so, that the 1969 Woodman deed to plaintiff contained a plain call which, on all the evidence, established beyond rational dispute the location on the face of the earth of the first boundary line described in the Woodman deed, that is, the easterly boundary. As thus determined, the easterly boundary line is the line on the appended Viitala site plan that commences at the point by Marsh Stream designated "pipe set by crooked ash tree" and runs northerly to the point at the road (Stream Road) indicated as "1 P."

Regarding the next, the northerly, boundary line called for by the Woodman deed to

plaintiff, the presiding Justice's opinion says that plaintiff claimed ambiguity in the Woodman deed, at least for the purpose of applying its calls to the face of the earth. This is so, plaintiff contended, because on the face of the earth two "bogs" exist that arguably could meet the calls of the deed. One of these "bogs", a very small one, is situated approximately forty (40) rods from the northeasterly corner of the land conveyed to plaintiff. A larger one, characterized by plaintiff as more appropriately a "bog", is situated approximately fifty-five (55) rods from that northeasterly corner. To assist in the resolution of this alleged ambiguity plaintiff adverted to another deed in evidence, an 1856 deed from David McDermot to John Quigley (hereinafter referred to as the Quigley deed), in which the boundaries of the land claimed by plaintiff are described as follows:

> "Beginning at a stake and ·a crooked maple tree at the Marsh Stream on the line between Theodore Campbell's lot and the lot now being described; thencè running northerly about forty rods to a small ash tree, and thence· also about forty rods northerly to a stake at the Main road on said line between this lot and said Theodore Campbell; thence on said road westerly about forty rods to a bog hole and a log in a fence with a notch cut in it; thence running southerly about eighty rods to the stream at the corner of an island in said stream; thence easterly by said stream about forty rods to the first mentioned bound."

This description in the Quigley deed was relied on by plaintiff, as the presiding Justice described plaintiff's undertaking,

> "to attempt to use this earlier description of the *southwest* corner [by its reference to the 'corner of an island in (Marsh) Stream' as a monument to fix said southwest corner] to show *where the northwest corner* should be located."

In disposing of plaintiff's contention, the presiding Justice acknowledged ·that the "corner of an island" monument designa-

tion in the Quigley deed would be relevant to fix the northwest corner of the land conveyed by the Woodman deed to plaintiff "*if* . . . [that] deed was ambiguous . . ." as to the location of that corner. (emphasis in original) The Justice then concluded, however, that he would not treat the monument reference in the Quigley deed as relevant to the placement of the northwesterly corner of the northerly boundary line because, in essence, he held that the Woodman deed to plaintiff was plain in its description of the northwesterly corner of the land conveyed. The Justice ruled that the "small bog" on the face of the earth met the call of the Woodman deed for a "bog hole." As to distance, the Justice stressed that the distance call in the Woodman deed "could be measured in the relatively uncomplicated area along the road" and was "almost exactly where the distance call in the deed would place it . . . ."

Thus, the presiding Justice decided, and we conclude without error, that the Woodman deed plainly fixed on the face of the earth the northerly, as well as the easterly, boundary line of the land conveyed to plaintiff. As so determined, that northerly bound appears on the appended Viitala site plan as the line shown running along Stream Road, commencing at the northeasterly corner point marked "1 P" and terminating at the northwesterly corner point marked "pipe", the length of the line being indicated as "660±" (approximately forty (40) rods).

It is at this step in the analysis that the presiding Justice brought into play his assumption of a mandate of parallelism. He thereby committed the error of law that led him to a legally erroneous ultimate conclusion as to the location of the third boundary line described in the Woodman deed, which is the westerly boundary line in dispute in this case. Having found, correctly, that the easterly and northerly boundary lines were plainly established, the presiding Justice thereafter encountered no difficulty in clos-

ing the boundaries of plaintiff's land according to the designations of the Woodman deed to plaintiff. By resorting to the assumption of parallelism, the Justice fixed the *course* of the westerly boundary line parallel to the course of the easterly boundary line already determined. Thus utilizing parallelism to direct course, the Justice fixed the southwesterly terminal point of the westerly boundary at the point where the parallel line joined Marsh Stream, as the monument stated in the Woodman deed to plaintiff. As thus determined, the westerly boundary line of plaintiff's land appears on the appended Viitala site plan marked "new painted line."

By so locating the westerly boundary line of plaintiff's land, in erroneous reliance on a commitment to the parallelism of the land's easterly and westerly boundaries, the presiding Justice reached the erroneous ultimate conclusion that the 1965 Emerson deed to defendants conveyed to defendants title to the entirety of the 9 acre parcel in dispute.

What is the situation, however, when the parallelism error is removed, as it must be, from the analysis of the presiding Justice? It then becomes apparent that difficulty does arise regarding the location of the western boundary of plaintiff's land as conveyed to plaintiff by the Woodman deed. More particularly, the difficulty relates to the determination of the western boundary's southwesterly terminal point. Absent an assumption of parallelism between the western and eastern boundaries, the Woodman deed, relative to the face of the earth, is unclear in its directives as to the location of the southwesterly corner of the land conveyed. As to the *course* to be followed by the westerly boundary from its determined starting point at the small bog, or "bog hole", the Woodman deed prescribes only the generality that the course is "southerly." The only monument given as to the southwesterly corner is Marsh Stream, without designation of some more particular point along its substantial and

somewhat meandering length. Lastly, the Woodman deed provides merely a distance call indicating the length of the westerly boundary line as "about eighty (80) rods", and this affords little guidance not only because of the irregular nature of the Marsh Stream but also because the evidence shows that the distance calls in the Woodman deed, with the exception of the distance capable of being measured with relative accuracy along Stream Road, are substantially "off."

■ Thus, without the assumption of parallelism to fix the *particular* course that the westerly boundary line takes from its established northwesterly point of beginning at the "bog hole", the Woodman deed to plaintiff is ambiguous, relative to the face of the earth, for the purpose of locating the southwesterly terminal point of the westerly boundary line of the land conveyed.

■ To resolve this ambiguity in the interpretation of the intendment of the Woodman deed to plaintiff resort may be had to extrinsic evidence, as available. Here, there is such extrinsic evidence, as constituted by the provisions of the 1856 Quigley deed. As a prior deed in plaintiff's chain of record title, the Quigley deed is relevant, and may properly be used, to assist in the interpretation of the meaning of the Woodman deed to plaintiff. *Abbott v. Abbott*, 53 Me. 356 (1865).[2]

Although the presiding Justice discussed the Quigley deed only in terms of its possible bearing on the northwesterly terminal point of the westerly boundary line (rejecting its relevance for this purpose), the Justice nevertheless made findings as to the Quigley deed that we may now utilize for the different purpose of resolving ambiguity in the Woodman deed as to the southwesterly terminal point of the westerly boundary line. The relevance of the Quigley deed lies in the reference it makes to a monument, additional to the Marsh Stream as such, for locating the southwesterly terminal point of the westerly boundary line. This additional monument is described as the "corner of an island" in the Marsh Stream. Considering the evidence that was presented before him, the presiding Justice stated as *fact* that presently there is on the face of the earth, if not what the Justice would designate "an island", what the Justice referred to as a "peninsula" that is "formed by the merger of the Marsh Stream and Clark Brook." This "tip of land", said the Justice, may reasonably be regarded as the monument to which the Quigley deed referred by the words "corner of an island" in the Marsh Stream.

■ On the basis of these statements by the presiding Justice, in combination with his other findings definitively, and correctly, fixing the locations of the easterly and northerly boundary lines of the land that the Woodman deed conveyed to plaintiff, the southwesterly terminal point of the westerly boundary line of the land conveyed becomes determinable *as a matter of law.* Once the presiding Justice's analysis is stripped of its erroneous legal assumption of parallelism, the only rational alternative for closing the boundaries of the land conveyed by the Woodman deed is to run the westerly boundary line from its correctly determined northwesterly starting point at the small bog, or "bog hole", in a southerly direction until it reaches the tip of land formed at the confluence of Marsh Stream and Clark Brook. These are the controlling

2. In thus adverting to the Quigley deed for interpretation purposes, we have not overlooked that it indicates a parallelism between the easterly and westerly boundaries of the parcel described by its references to the length of the northerly and southerly boundary lines as being "about forty rods." We have rejected this information in the Quigley deed as establishing a legal mandate of parallelism because a distance specification along the Marsh Stream (the southerly boundary) could be expected to be a much rougher approximation than one derived from measuring along Stream Road (the northerly boundary) where, as the presiding Justice himself emphasized, the area was "relatively uncomplicated."

monuments fixed by the relevant deeds in plaintiff's chain of title and which, as stated by the presiding Justice, are reasonably identifiable as presently existing on the face of the earth. As thus determined, the westerly boundary of plaintiff's land would be marked on the appended Viitala site plan as a line commencing at the Stream Road at the point marked "pipe", running southerly to a southwesterly terminal point at the tip of land formed at the confluence of Marsh Stream and Clark Brook, this southwesterly point appearing on the site plan as the junction of the line marked "line testified to at trial" with the Marsh Stream-Clark Brook confluence.

The entry is:

(1) Plaintiff's appeal sustained;

(2) the judgment entered on plaintiff's complaint is set aside, except as to its adjudication denying damages to plaintiff;

(3) the judgment thus left remaining on plaintiff's complaint is modified to read as follows:

"On the complaint of plaintiff, the westerly boundary line of the parcel of land owned by plaintiff in fee simple, as having been conveyed to plaintiff in 1969 by deed of Clifford E. and Arlene Woodman is adjudicated to be: 'From the small bog, or bog hole, adjoining Stream Road, so-called, which said bog is located approximately 15 rods easterly of a large bog that also adjoins said Stream Road, this point being the northwesterly corner of plaintiff's land, running southerly to the tip of land formed by the merger, or confluence, of Marsh Stream and Clark Brook, this being the southwesterly corner of plaintiff's land'; no damages to plaintiff on his complaint";

(4) the judgment entered on the counterclaim of defendants is set aside, except as to its adjudication denying damages to defendants;

(5) the judgment thus left remaining on defendants' counterclaim is modified to read as follows:

"On the counterclaim of defendants, the easterly boundary line of the land owned by defendants in fee simple, as having been conveyed to them by the 1965 deed of C. Oliver Emerson and Beatrice Emerson, is the westerly boundary line of the land of plaintiff as adjudicated in (3) hereinabove; no damages to defendants on their counterclaim;

(6) as so modified the judgment on plaintiff's complaint and the judgment on defendants' counterclaim are affirmed;

(7) case remanded to the Superior Court for entry of the respective judgments herein affirmed as modified;

(8) costs on appeal to plaintiff.

POMEROY, J., did not sit.
Appendix to follow.

## APPENDIX